THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMEL L. COLLINS, Defendant-Appellant.

Second District   No. 2—02—1134

Opinion filed July 13, 2004.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GROMETER delivered the opinion of the court:

Following a jury trial in the circuit court of Lake County, defendant, Jamel L. Collins, was convicted of first-degree murder (720 ILCS 5/9—1(a)(1) (West 2000)). Defendant was sentenced to 35 years' imprisonment. He now appeals, challenging both his conviction and his sentence. Defendant raises four issues. First, he contends that he was prejudiced when a juror visited the crime scene during the trial. Second, he alleges error in the trial court's decision to permit the introduction of certain hearsay testimony. Third, he asserts that his trial was unfairly prejudicial because (a) the court referred to the jurors by number rather than name and (b) certain comments the State made during argument fell outside the bounds of proper argumentation. Finally, he argues that his sentence is excessive. We agree with the first contention; thus, we reverse and remand for a new trial. As the second two issues raised by defendant are likely to recur on retrial, we will also address them. However, our disposition makes it unnecessary to address defendant's argument regarding sentencing. The facts are relatively discrete as they relate to the issues, and we will address them in the context of defendant's various arguments.

## I. The Jury Foreman's Independent Investigation of the Crime Scene

Defendant first claims he was prejudiced when the foreman of the jury visited the crime scene during the first day of testimony. Defendant raised this issue in a posttrial motion, and the trial court held an evidentiary hearing on the matter. During the hearing, a juror, Andrew Sawicki, testified that he was the foreman of the jury. As foreman, he led discussions in the jury room, but he denied using any knowledge he gained from visiting the scene in doing so. During the hearing, the judge asked Sawicki, "Did your visit to the crime scene on the second day of trial aid you in determining the guilt or innocence of the defendant?" Sawicki replied, "I would have to say yes." Sawicki then added, "Yes, it did aid my—it didn't help me sway one way or the other, it just helped me." The court then inquired as to how the visit helped him, and he stated:

"The first day of the trial—I had never been in this experience

before. And I'm just watching people being brought up. They're telling their story about this event that occurred in about, you know, half a block. And all it's going to be is this—what it looked like to me was an endless parade of people saying I was here, I did this, I was on the east side of that, then I went over to the west side of that. And I was trying to write it down and did not understand. I could not collect that data from what they were telling me. And I was afraid, because—this was a big decision that I was asked to make. If I just knew what it looked like. And then after that when people started talking, because I didn't know—I thought the defense was going to have another parade of people coming on saying I was here, you were there. And I was afraid of that, and I just wanted to know what the stage was.

So I walked—I walked out, down the street, looked at it, and said fine, great, now I know where it is. When people say I was on here [*sic*], I know where it is and I'm—and the second day it was much more helpful for me because I can understand what—where people were on the scene."

The court then asked, "Did that help you in determining the guilt or innocence of the defendant with respect to the murder charge?" Sawicki answered, "Yes, it did." The State asked whether Sawicki had viewed photographs of the scene during the trial. He said, "No, I found them difficult to view." Regarding an aerial photograph that was given to the jury during deliberations, Sawicki stated that it would not have been helpful while he was listening to witnesses and trying to remember what they said.

Defendant objected to this entire line of questioning as an impermissible inquiry into the mental processes of the jury. The trial court overruled the objection. The State did not object, and, in fact, posed the question, "[H]ow is [the impact of the extraneous information to be assessed] if jurors cannot be questioned as to their exact deliberation process?" On appeal, the State now reverses its course and argues that "Sawicki's statement should not have been before the trial court." Defendant does not contest the trial court's decision to overrule his objection.

■ The rule that precludes the inquiry into the mental processes of a jury is a rule of evidence rather than a substantive limitation on how a verdict can be impeached. See, *e.g.*, *People v. Holmes*, 69 Ill. 2d 507, 511-16 (1978) (citing both Professor Wigmore's treatise on the rules of evidence (8 J. Wigmore, Evidence 696 (McNaughton rev. ed. 1961)) and Federal Rules of Evidence 606(b) (Fed. R. Evid. 606(b))). As we will explain below, the trial court erred in admitting this evidence. However, it is well established that, absent an objection, otherwise inadmissible evidence is to be given its full probative effect. *Jackson v.*

*Board of Review of the Department of Labor*, 105 Ill. 2d 501, 508 (1985) ("It is well established that when hearsay evidence is admitted without an objection, it is to be considered and given its natural probative effect"); *People v. Marcotte*, 337 Ill. App. 3d 798, 803 (2003) ("The defendant, however, did not object to Kunce's statement as hearsay, or on any other grounds, either in court or in her posttrial motion. Because the defendant did not object to its admission, Kunce's assertion that DCFS received the call could be considered by the judge and given its natural probative effect"); *Bridgestone/Firestone, Inc. v. Doherty*, 305 Ill. App. 3d 141, 149 (1999) ("Hearsay evidence admitted without objection may be considered and given its natural probative effect"). Moreover, the State argued that the trial court should consider Sawicki's testimony, and it is thus precluded from arguing that this evidence was improperly admitted. See *McMath v. Katholi*, 191 Ill. 2d 251, 256 (2000) ("After inviting the trial court to rule on the admissibility of the evidence based on Rule 220, plaintiff is precluded from complaining now that the circuit court's ruling was erroneous based on some other evidentiary rule").

In *Holmes*, 69 Ill. 2d at 511, quoting *People v. Holmes*, 41 Ill. App. 3d 956, 969 (1976), the supreme court considered the rule that " 'a jury cannot impeach its verdict by either affidavit or testimony.' " It identified two general categories into which an attempt to impeach a verdict could fall. The first category involves instances where the attempt is based on the motives, methods, or processes the jury used to reach its conclusion. *Holmes*, 69 Ill. 2d at 511. The second involves attempts to show that some outside conditions or events have been brought to the attention of the jury. *Holmes*, 69 Ill. 2d at 512. Evidence of the first sort is inadmissible; evidence of the second type may be used to impeach a verdict. *Holmes*, 69 Ill. 2d at 511-12; see also *People v. Hobley*, 182 Ill. 2d 404, 458 (1998) ("In order to demonstrate such prejudice, jurors may testify as to the nature of outside influences or communications, but evidence relating to the effect of such influences on the mental processes of the jurors is inadmissible").

■ Not every instance in which extraneous information reaches the jury constitutes reversible error. *People v. Palmer*, 125 Ill. App. 3d 703, 712 (1984). When such information reaches the jury, however, it is presumptively prejudicial (*People v. Mitchell*, 152 Ill. 2d 274, 341 (1992)), and a defendant need show only that the information relates directly to something at issue in the case and that it may have influenced the verdict (*Birch v. Township of Drummer*, 139 Ill. App. 3d 397, 409 (1985)). The burden then shifts to the State to demonstrate that the incident is harmless. *People v. Harris*, 123 Ill. 2d 113, 132 (1998); *Birch*, 139 Ill. App. 3d at 409. A verdict may stand only if it is

"obvious" that no prejudice accrued to the defendant. *Hobley*, 182 Ill. 2d at 462.

Generally, the inquiry focuses on the relationship between the extraneous information and the issues at trial in a rather abstract sense. The *Holmes* court observed, " 'Because the actual effect of the conduct on the minds of the jury cannot be proved, the Illinois Supreme Court has held that the standard to be applied is whether the "conduct involved 'such a probability that prejudice will result that it is [to be] deemed inherently lacking in due process.' [Citation.]" [Citation.]' " *Holmes*, 69 Ill. 2d at 514, quoting *United States ex rel. Tobe v. Bensinger*, 492 F.2d 232, 237 (7th Cir. 1974).

■ However, in this case, we are presented with a rather unusual circumstance. Evidence concerning the effect of Sawicki's visit on his determination was admitted into evidence without objection by, and with the encouragement of, the State. Under such circumstances, the evidence is to be given its natural probative effect (*Jackson*, 105 Ill. 2d at 508), and the State is precluded from complaining about an error it invited (*McMath*, 191 Ill. 2d at 256). In light of this evidence, we need not consider the effect that Sawicki's visit to the scene might have had in an abstract or theoretical sense; we know exactly what the effect was because Sawicki told us.

What Sawicki told us is that his trip to the scene aided him in determining guilt or innocence. While he attempted to downplay the effect of his investigation, saying it did not sway him one way or the other, it nevertheless had an impact upon his decision. There is simply no way for matters outside the record to properly bear upon the rendering of a verdict. Because Sawicki acknowledged that the visit had some effect on the ultimate determination of guilt or innocence, we will not inquire further into exactly how his view of the scene impacted upon his verdict. We observe that, despite Sawicki's statement that the visit did not sway him, there are a myriad of subtle ways that it could have affected his verdict. Presumably, he believed that visiting the scene would serve some purpose. He stated that he was having trouble understanding where people were during the incident. Since he considered this information important, it is likely that he used it for something. A likely use would seem to be evaluating the credibility of witnesses in terms of how good a view they had of the events. If so, this creates another problem. See *Brown v. Johnson*, 92 Ill. App. 3d 1095, 1100 (1981).

In its brief, the State contends that there is no problem involving defendant's inability to confront Sawicki in open court to test the knowledge he gained from his visit. We disagree. A police officer testified that the area had not changed between the date of the incident

and the time of Sawicki's investigation. However, we note that a number of variables exist that could have affected witnesses' perceptions of the events despite the fact that the scene had not changed. These things include lighting, weather, pedestrian traffic, and vehicular traffic. In short, the scene that Sawicki viewed was almost assuredly not the same as it was on the night of the incident.

Consequently, we must reverse and remand for a new trial. As noted above, the burden shifts to the State to show lack of prejudice once a defendant shows that the extraneous information that reached the jury related to something at issue in the trial. *Harris*, 123 Ill. 2d at 132. Here, the information related directly to something at issue; it related to the entire incident itself and also likely to the credibility of witnesses. Given Sawicki's testimony, the State has not sustained, and probably could not sustain, its burden of demonstrating that defendant suffered no prejudice.

Before concluding, we will briefly address two points the State raises in attempting to show lack of prejudice. First, the State contends that Sawicki's investigation did not prejudice defendant because any information he garnered was cumulative of photographs of the scene. In *Birch*, 139 Ill. App. 3d at 409, the court held, "A verdict in a civil case ordinarily need not be set aside because the jurors made an unauthorized visit to the scene of an accident where the visit disclosed nothing about the location not accurately depicted by photographs, maps, diagrams, or the like lawfully admitted into evidence." That the scene was "accurately depicted," at least for Sawicki's purposes, is belied by his testimony that photographs available to him during trial were "difficult to view" and that those available during deliberations came too late to assist him. Again, the State bears the burden of showing lack of prejudice. We cannot pretend that the pictures introduced at trial dispelled any prejudice accruing to defendant when Sawicki flatly testified that they were inadequate. Pointing to these pictures is not sufficient to sustain the State's burden in light of his testimony. Second, we attach no significance to the fact that Sawicki did not inform other jurors of his investigation until after they reached a verdict. Sawicki was a juror, and his personal verdict was necessary to convict defendant. See *People v. Pittman*, 326 Ill. App. 3d 297, 300 (2001) (unanimous verdict required to support a conviction).

## II. Hearsay and the State of Mind Exception

■ The second issue defendant raises is likely to recur if this case is retried; therefore, we will address it briefly. Defendant contends that the hearsay testimony of Scott Holbert, who stated that he heard the victim state "I'm all about a fair fight" and "I don't want to get

stabbed" between the time of the initial confrontation between defendant and the victim and the time of the stabbing, should not have been admitted. Pertinent to the instant case, our supreme court has stated, "Statements that indicate the declarant's state of mind are admissible as exceptions to the hearsay rule when the declarant is unavailable to testify, there is a reasonable probability that the proffered hearsay statements are truthful, and the statements are relevant to a material issue in the case." *People v. Caffey*, 205 Ill. 2d 52, 91 (2001).

Defendant first argues that the victim's state of mind was not relevant to any material issue in the case; hence, the statement should have been excluded on relevancy grounds. However, it seems obvious to us that evidence pertaining to the state of mind of a victim when a defendant argues self-defense is relevant to the extent it bears upon who was the aggressor. See *People v. Salazar*, 126 Ill. 2d 424, 482 (1988) (Clark, J., dissenting, joined by Stamos, J.) ("I would agree with the majority that most of the testimony by the victim's wife was relevant as bearing on the victim's state of mind on the day in question; particularly in light of the defendant's claim that the victim was the aggressor and had been drinking").

Defendant also argues that the statement did not bear sufficient indicia of reliability to be admissible. Defendant misconstrues this requirement. The majority of his argument is focused on attacking Holbert's credibility. Holbert, however, testified in open court, subject to cross-examination. His credibility could thus be tested and assessed by the jury. The proper inquiry focuses upon the probability that *the statement* is truthful, that is, are there sufficient indicia of reliability regarding the statement such that it accurately reflects the victim's state of mind? See *Caffey*, 205 Ill. 2d at 92 ("Defendant points to the above-mentioned corroborative portions of Pettaway's testimony as support for the truthfulness of Ward's hearsay statement. These facts do indicate that Ward possibly wanted to buy drugs from defendant. However, they do not indicate the reliability of Ward's statement to Pettaway; they do not add up to a reasonable probability of the truthfulness of Ward's statement"). Accordingly, defendant's argument is ill-taken. Nothing we say here precludes defendant from attacking the reliability of the statement on some other, proper ground when this case is retried.

### III. The Atmosphere of the Trial

■ Defendant also contends that the atmosphere of the trial was prejudicial to him for two reasons. First, he argues that the Lake County practice of referring to jurors by number rather than name

constituted error. He also complains of certain remarks made by the State during argument.

Not disclosing the names of jurors during a trial can be problematic. See *United States v. Mansoori*, 304 F.3d 635, 649-52 (7th Cir. 2002). Doing so may undermine the presumption of innocence by intimating that a defendant is a dangerous person. *Mansoori*, 304 F.3d at 650. The State counters that it is Lake County's practice to refer to jurors by number in all trials, which negates the inference that defendant is in some way dangerous. Moreover, the State points out, the jury was not truly anonymous, since the parties were given forms that listed each juror's name and town of residence. We agree with the State that these facts do negate the inference that defendant is a dangerous person. However, they do so only if the jury is aware of them. Hence, it would be good practice for trial courts to insure that juries are made aware of these facts in this and all trials.

As for defendant's second contention, we agree that the State, at times, approached the bounds of improper argumentation. Some of defendant's complaints are ill founded. For example, the State referred to defendant as a "schoolyard bully." Defendant reads this statement literally, arguing that it was improper because there was no evidence regarding defendant's school disciplinary record. We take it, and believe that it was intended, as a metaphor. Evidence in the record did show behavior on defendant's part that could be characterized as bullying. On the other hand, the State's description of defendant as wearing beads and a blue bandana appears to us to be an attempt to imply that defendant was involved in a gang. Evidence of gang membership is not admissible unless it is related in some way to the crime charged (*People v. Alvarez*, 344 Ill. App. 3d 179, 190 (2003)); *a fortiori*, it should not arise in argument unless relevant to something at issue in the case. Argument calculated solely to inflame the passions of the jury is improper. *People v. McCollum*, 239 Ill. App. 3d 593, 598 (1992). We caution the State that such comments can constitute reversible error. See, *e.g.*, *People v. Clark*, 335 Ill. App. 3d 758, 764-68 (2002).

## IV. CONCLUSION

In light of the foregoing, the judgment of the circuit court of Lake County is reversed. We remand this matter for a new trial.

Reversed and remanded.

McLAREN, J., concurs.

JUSTICE KAPALA, dissenting:

I believe that defendant failed to establish that the jury was exposed to a prejudicial outside influence that deprived him of a fair trial. Therefore, I would affirm the trial court's denial of defendant's motion for a new trial. The majority's determination that we are permitted by way of procedural default to consider the juror's testimony about his personal thought process violates the well-established rule that a jury verdict cannot be impeached by a juror's statement about the motive, method, or process by which the jury reached its verdict. Accordingly, I respectfully dissent.

Jurors may testify as to the *occurrence* of improper outside influences. *People v. Hobley*, 182 Ill. 2d 404, 457-58 (1998); *People v. Holmes*, 69 Ill. 2d 507, 512-14 (1978). However, it is well settled that a juror's testimony about the *effect* of those outside influences or communications on the mental processes of the jurors is inadmissible. *People v. Williams*, 209 Ill. 2d 227, 241 (2004); *Hobley*, 182 Ill. 2d at 458; *Holmes*, 69 Ill. 2d at 514. "[B]ecause the actual effect of the conduct on the minds of the jurors cannot be proved, the standard to be applied is whether the conduct involved ' "such a probability that prejudice will result that it is [to be] deemed inherently lacking in due process." ' " *Hobley*, 182 Ill. 2d at 458, quoting *Holmes*, 69 Ill. 2d at 514, quoting *Estes v. Texas*, 381 U.S. 532, 542-43, 14 L. Ed. 2d 543, 550, 85 S. Ct. 1628, 1633 (1965).

Accordingly, the trial court erred when it asked juror Sawicki questions eliciting information concerning the effect that his improper visit to the crime scene had on his mental processes, and abused its discretion in admitting that part of Sawicki's testimony. After doing so, however, it is clear that the trial court properly gave this testimony no weight and concluded that defendant's right to a fair trial was not prejudiced by the juror's visit to the crime scene. In contrast, the majority uses the improperly admitted evidence in its analysis, concludes that defendant's right to a fair trial was prejudiced, and reverses the trial court's order denying defendant's motion for a new trial. In considering the improperly admitted evidence in its analysis, the majority has abandoned the well-established rule that facts which tend to show the deliberative process of the jury in reaching its verdict cannot be used to impeach the jury verdict (*People v. Towns*, 157 Ill. 2d 90, 112 (1993)).

The majority takes the position that because the State did not object to the admission of the improper evidence regarding juror Sawicki's mental processes, the trial court did not err in giving the evidence its natural probative effect. 351 Ill. App. 3d at 178-79. The majority cites various authorities for the proposition that a party's failure to

object to hearsay testimony presented at trial allows such evidence to be considered by the trier of fact and to be given its natural probative effect. 351 Ill. App. 3d at 178-79. The majority concludes that the rule precluding inquiry into the mental processes of a jury is a rule of evidence and not a substantive limitation on how a verdict can be impeached. I come to a different conclusion.

The rule allowing jurors to testify about their exposure to an improper outside influence but prohibiting their testimony regarding the effect of such outside influences on their mental processes is a rule of evidence, as it establishes what evidence regarding the outside influence is admissible and what evidence is inadmissible. However, in addition to being an evidentiary rule, it is also a component of the abstract analytical framework set out in *Hobley*, that is:

> "A jury verdict will be set aside as a result of outside influences or communications only if the defendant was prejudiced as a result of the improper communication or outside influence. [Citations.] In order to demonstrate such prejudice, jurors may testify as to the nature of outside influences or communications, but evidence relating to the effect of such influences on the mental processes of the jurors is inadmissible. [Citation.] Accordingly, because the actual effect of the conduct on the minds of the jurors cannot be proved, the standard to be applied is whether the conduct involved ' "such a probability that prejudice will result that it is [to be] deemed inherently lacking in due process." ' " *Hobley*, 182 Ill. 2d at 458, quoting *Holmes*, 69 Ill. 2d at 514, quoting *Estes*, 381 U.S. at 542-43, 14 L. Ed. 2d at 550, 85 S. Ct. at 1633.

I agree with the majority's observation that this inquiry focuses on the relationship between the extraneous information and the issues at trial in a rather abstract sense. As this analytical procedure is abstract, it centers on the probability of prejudice, not whether prejudice to the defendant's right to a fair trial actually occurred. The abstract analytical procedure serves to implement the general rule that a jury verdict may not be impeached by statements of jurors after they have rendered their verdict, have been polled, and are discharged from service (*Hobley*, 182 Ill. 2d at 457). The sound policy reason for this rule has been repeatedly stated. Were the rule otherwise:

> " ' "Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." ' " *Williams*, 209 Ill. 2d at 239, quoting *Tanner v. United States*, 483 U.S. 107, 119-20, 97 L.

Ed. 2d 90, 105-06, 107 S. Ct. 2739, 2747 (1987), quoting *McDonald v. Pless*, 238 U.S. 264, 267-68, 59 L. Ed. 1300, 1302, 35 S. Ct. 783, 784 (1915).

See also *Hobley*, 182 Ill. 2d at 457, quoting *Tanner*, 483 U.S. at 119-20, 97 L. Ed. 2d at 105-06, 107 S. Ct. at 2747, quoting *McDonald*, 238 U.S. at 267-68, 59 L. Ed. at 1302, 35 S. Ct. at 784.

Accordingly, even if the State's failure to object to Sawicki's testimony regarding the effect of his visit to the crime scene on his mental process allows us to give this improperly admitted testimony its natural probative effect, it is clear that it has no probative effect because it is irrelevant. The actual effect of the improper outside influence on Sawicki's mind cannot be considered and such evidence is not a part of the analysis applicable to this issue. The fact that the trial court erroneously admitted such evidence does not change the applicable analytical procedure that serves the sound policy of protecting jurors, the certainty of their verdicts, and, in turn, the integrity of our jury system.

The majority also takes the untenable position that because the State argued that the trial court should consider Sawicki's testimony, it is precluded from arguing on appeal that this evidence was improperly admitted. See 351 Ill. App. 3d at 179. The majority's position is untenable because its premise is erroneous. The State did not argue before the trial court that it should consider Sawicki's testimony regarding the effect that his visit to the crime scene had on his deliberative process.

At the hearing on defendant's motion for a new trial, the trial court conducted the examination of juror Sawicki. The trial court asked Sawicki questions submitted by the parties. In response to those questions, Sawicki related that he had visited the area of Sheridan Road and Martin Luther King Jr. Drive in North Chicago after the first day of trial testimony. Sawicki said that he did not use any information that he learned from his visit to lead jury deliberations and did not inform the other jurors that he had gone to the scene until after deliberations were complete and the jury had rendered its verdict. Next, the trial court asked the following question *sua sponte*: "Did your visit to the crime scene on the second day of trial aid you in determining the guilt or innocence of the defendant?" Counsel for defendant objected to the question as an improper inquiry into the mental processes of the jury. The trial court explained that it would be unable to determine if the outside influence at issue was improperly brought to bear upon Sawicki unless Sawicki was asked the question. The assistant State's Attorney asserted:

"Judge, just as to that question, you wonder how you're going to

find if it's prejudicial. Judge, the State has found People verses [*sic*] Hobley where there was a standard that was set out for use. And that's at 636 N.E.2d 313, 162 Ill. 2d 404. So it is a Supreme Court case.

So the Supreme Court said as to can the juror be questioned as to anything in the deliberating process, anything into what they discussed or what their state of mind was during the deliberation, Hobley states the standard to be applied is whether the conduct involved such a probability that prejudice will result that it is to be deemed inherently lacking in due process. That is the standard that the courts must apply because they cannot go into the deliberation process itself."

After these comments, the trial court said that it was not going into the deliberation process, and the assistant State's Attorney replied, "I'm not saying that you're going into the deliberation process." Thereafter, the trial court overruled defense counsel's objection to the question. Sawicki then answered the trial court's question as is set out in the majority opinion. See 351 Ill. App. 3d at 177-78.

Based on the foregoing, I cannot agree with the majority's conclusion that the State encouraged the admission of evidence concerning the effect of Sawicki's visit to the crime scene on Sawicki's mental process. The assistant State's Attorney demonstrated her awareness of the *Hobley* decision and specifically stated that courts cannot go into the deliberation process itself. When the majority quotes the assistant State's Attorney as posing the question, " '[H]ow is [the impact of the extraneous information to be assessed] if jurors cannot be questioned as to their exact deliberation process?' " (351 Ill. App. 3d at 178), it takes the assistant State's Attorney's question out of context such that its meaning is altered. The exact quote of the assistant State's Attorney, in context, is as follows:

"So if the extraneous information in this case weighs directly on an issue in the case is what it boils down to. That is the burden that the State in this case must show did not happen. It switches over to us basically, Judge. And that's in Birch verses [*sic*] Drummer.

Now, how is this proven if jurors cannot be questioned as to their exact deliberation process? And as I stated earlier, the standard to be applied is whether the conduct involved such a probability that prejudice will result that it is to be deemed inherently lacking in due process."

Clearly, rather than a statement indicating that the State felt that it was permissible to ask juror Sawicki whether his visit to the crime scene aided him in determining defendant's guilt or innocence, the assistant State's Attorney's question was rhetorical and was followed by

an answer, specifically her recitation of the appropriate analysis to be applied. Based on the foregoing, it is clear that the State never took the position before the trial court that it was permissible for the trial court to consider the effect of Sawicki's visit to the crime scene on his mental deliberative process. Accordingly, I cannot agree that the State has taken a position on appeal that is inconsistent with a position it took before the trial court.

It is apparent to me that the trial judge, like the assistant State's Attorney and defense counsel, was aware of the applicable analytical procedure. The trial judge understood that inquiry into the mental processes of the juror was impermissible. The trial court's error was its apparent conclusion that the question regarding the effect of the visit to the crime scene on the juror's determination of guilt or innocence did not intrude into the juror's deliberative process. In any event, based on the comments made by the trial court in ruling on defendant's motion for a new trial, I believe that it properly concluded that defendant's right to a fair trial was not compromised:

"In this particular case the jury had already received photographs, aerial photos and a map, not a map, but aerial photos and the photographs at the time when they went back to deliberate. I find that the scene—that what the juror went to see at the scene was merely cumulative as set out by the testimony he gave before this court. It wasn't any different when he saw it. He also testified he never shared that with any of the jurors. The scene in the opinion of this court was not crucial to the issue of self-defense. It did not play a role in determining the guilt of [sic] innocence of the defendant. He used it, as he stated, in my mind I knew what it looked like. So the next day he basically says then when they were talking about it, I knew what they were talking about.

Based upon the testimony of Mr. Zawicki [sic], based upon the case law that I've read, the court is denying the defendant's motion."

What is not clear from these comments is whether the trial court found that defendant failed to meet his initial burden of alleging a prejudicial outside influence or that, after the burden shifted to the State to establish harmlessness, the State did so. In *Hobley*, our supreme court wrote:

"Long ago, the United States Supreme Court recognized that '[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear.' [Citations.] The standard to be applied in such a situation was explained by this court in *People v. Mitchell*, 152 Ill. 2d 274 (1992):

' "It is well settled in Illinois that any communication with a juror during trial about a matter pending before the jury is deemed presumptively prejudicial to a defendant's right to a fair trial. Although this presumption of prejudice is not conclusive, the burden rests upon the State to establish that such contact with the jurors was harmless to defendant. [Citations.] A verdict will not be set aside where it is obvious that no prejudice resulted from a communication to the jury, either by the court or by third persons outside the presence of the defendant." ' " *Hobley*, 182 Ill. 2d at 459-60, quoting *Mitchell*, 152 Ill. 2d at 341, quoting *People v. Harris*, 123 Ill. 2d 113, 132 (1988).

Recently, our supreme court in *Williams* held that "[t]he lesson of *Hobley* is that a juror affidavit alleging exposure to '*prejudicial* outside influences' (emphasis added) (*Hobley*, 182 Ill. 2d at 459), is sufficient to raise a presumption of prejudice and to shift the burden to the State to establish that such contacts were harmless." *Williams*, 209 Ill. 2d at 241. The court went on to conclude that the juror's affidavit at issue did not establish that the improper conversation between the juror and her husband about an issue in the case was prejudicial, because it contained nothing more than the mere assertion that an improper conversation occurred, without evidence that the alleged conversation was prejudicial in any respect. *Williams*, 209 Ill. 2d at 241-42.

Accordingly, the first determination to be made in this case is whether the admissible and properly considered portions of juror Sawicki's testimony amounted to sufficient allegations of a prejudicial outside influence as is required to raise a presumption of prejudice under *Williams*. Clearly, it was proper for Sawicki to testify that he went to the location, when he went there, and what he did while there. *Hobley*, 182 Ill. 2d at 458 (in order to demonstrate prejudice from improper outside influence, jurors may testify to the nature of outside influence). This portion of Sawicki's testimony, however, amounts to nothing more than an assertion that Sawicki indeed went to the scene of the crime after the first day of trial testimony and walked the half-block in the vicinity of the intersection of Sheridan Road and Martin Luther King Jr. Drive.

The only disputed issue in this case was whether defendant acted in justifiable self-defense when he stabbed Jamie Hernandez five times, thereby causing Hernandez's death. The evidence presented by the State established that defendant and Hernandez, both naval recruits on liberty, agreed to fight behind a liquor store located on the west side of Sheridan Road across from gate four of the Great Lakes Naval Training Center in North Chicago. Five or ten minutes after going

behind the liquor store, Hernandez came running out from behind the building, followed by defendant, who was carrying a silver knife. Defendant put the knife in his pocket and was heard to yell, "I'm going to get you" as he emerged from behind the liquor store. No witnesses observed blood on Hernandez's body at that time and he did not appear injured. Defendant crossed to the east side of Sheridan Road while Hernandez remained on the west side of Sheridan Road. Both men walked parallel to one another in a southerly direction on opposite sides of Sheridan Road until each began to cross Sheridan Road toward the other at the intersection of Sheridan Road and Martin Luther King Jr. Drive. A physical altercation took place in the street, from which Hernandez emerged with five fatal stab wounds to his chest, abdomen, and groin. Defendant walked past Hernandez's friends as he left the area and was heard to say, "your friend's a bitch, and he was running from me the whole time."

Defendant, on the other hand, testified that when he agreed to go behind the liquor store for the purpose of fighting Hernandez, he had no weapon of any kind and he assumed that Hernandez was also unarmed. Defendant said that he and Hernandez entered the alley behind the liquor store and got into a fistfight. According to defendant, during the fight Hernandez produced a knife, causing defendant to believe that he was going to be stabbed. Defendant said that he grabbed Hernandez's right hand (the hand holding the knife), wrestled Hernandez, and gained control over the knife. As the fight continued, defendant feared that Hernandez would regain control of the knife, so defendant stabbed Hernandez once in Hernandez's left side. Defendant said that while he still had the knife, he and Hernandez ran from the alley. According to defendant, Hernandez walked south along the west side of Sheridan Road while he, fearful of Hernandez and in an attempt to stay away from Hernandez, crossed to the east side of Sheridan Road and headed toward his friends who were standing near gate four on the east side of Sheridan Road. Defendant testified that as he approached the railroad tracks in front of gate four, Hernandez came up behind him and struck him in the eye and then hit him twice more. Defendant said that he was frightened and, acting in self-defense, stabbed Hernandez again. Defendant maintained that he did not intend to kill Hernandez or to do him great bodily harm but admitted that he stabbed Hernandez a total of five times.

The jury was instructed that, in addition to proving the other elements of first-degree murder, the State had to prove that defendant was not justified in using the force which he used. The jury was instructed further:

"A person is justified in the use of force when and to the extent

that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.

However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent the imminent death or great bodily harm to himself."

See Illinois Pattern Jury Instructions, Criminal, No. 24—25.06 (4th ed. 2000).

With respect to defendant's claim of self-defense, the important disputed issues of fact were whether Hernandez had already been stabbed when he ran out from behind the liquor store, and whether the second physical altercation was initiated by defendant in the intersection or by Hernandez near the railroad tracks when he approached defendant from behind and punched defendant in the eye. Additionally, defendant's claim that he acted in justifiable self-defense would be negated if the State proved beyond a reasonable doubt that the type and amount of force used by defendant was unnecessary under the circumstances. See *People v. Belpedio*, 212 Ill. App. 3d 155, 161 (1991).

The testimony of the eyewitnesses to this incident was vital to the determination of these disputed issues; the physical characteristics and layout of the vicinity of the crime scene were not. The party attempting to impeach the verdict with an improper outside influence need show only that the unauthorized information relates directly to an issue in the case and may have improperly influenced the verdict. *Birch v. Township of Drummer*, 139 Ill. App. 3d 397, 409 (1985). Sawicki's testimony made no such showing. Sawicki's testimony that he merely visited the vicinity of the crime scene had no direct relation to the determination of these issues. Sawicki did not testify that he checked lighting conditions, vantage points from which witnesses viewed the incident, or distances between locations within the vicinity. In other words, Sawicki did not testify to facets of his visit that could possibly bear on the credibility or perception of the witnesses who testified at trial. Like the affidavit at issue in *Williams*, which concerned an improper conversation between a juror and her husband but contained no information about the content of that conversation (*Williams*, 209 Ill. 2d at 241-42), Sawicki's testimony contained no information about the content of his visit to the crime scene. Accordingly, Sawicki's testimony did not amount to an allegation of a "prejudicial outside influence" (*Williams*, 209 Ill. 2d at 241) and, therefore, defendant failed to meet his initial burden and his motion for new trial was properly denied.

Even assuming *arguendo* that the admissible portion of Sawicki's

testimony was sufficient to raise a presumption of prejudice, I would find that the State succeeded in establishing that the visit to the crime scene was harmless. I agree with the trial court's determination that Sawicki's mere visit to the crime scene, without further investigation, exposed him only to extraneous evidence that was cumulative of the aerial photographs depicting the vicinity of Sheridan Road and Martin Luther King Jr. Drive that were presented by the State at trial. Moreover, counsel for defendant conceded at oral argument that, apart from Sawicki's testimony about the effect that his visit to the crime scene had on his determination that defendant was guilty, defendant was not prejudiced by the improper visit.

For these reasons, I would hold that the trial court did not err in denying defendant's motion for new trial and I would proceed to an analysis of defendant's remaining appellate contention that his sentence was excessive.